UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ROBERT VALENZUELA,<br><br>        Plaintiff,<br><br>    v.<br><br>BATTELLE ENERGY ALLIANCE, LLC;<br>JEREMY SCHWARTZ; DAVID WILLIS;<br>and JEFF JENNINGS,<br><br>        Defendants. | Case No. 4:23-CV-0032-AKB<br><br>**MEMORANDUM DECISION<br>AND ORDER** |

## INTRODUCTION

Before the Court is a motion to stay proceedings and to compel arbitration filed by Defendants Battelle Energy Alliance, LLC (BEA), Jeremy Schwartz, David Willis, and Jeff Jennings. (Dkts. 13, 14). For the reasons explained below, the Court will grant the motion.

## BACKGROUND

Plaintiff Robert Valenzuela, who has a "Hispanic background" (Dkt. 15-10 at ¶ 2), began working for BEA in June 2014 as a security officer. (Dkt. 1 at ¶¶ 11-13). This position was a union-represented position, which was covered by a collective bargaining agreement. (Dkt. 13-1 at p. 3). A few months after beginning as a security officer at BEA, Valenzuela's "managers and some co-workers began referring to him by the name 'dirty,'" a racial slur related to "his skin color and Mexican heritage." (Dkt. 1 at ¶¶ 14, 16). When the name-calling continued and BEA did not promote Valenzuela, he reported the conduct to the human resources department, which he alleges failed to address the discrimination and harassment. (*Id.* at ¶¶ 22-31).

In June 2021, Valenzuela retained legal counsel to pursue employment-related claims on his behalf against BEA, and in September 2021, he filed charges of discrimination with the Equal Employment Opportunity Commission (EEOC) and the Idaho Human Rights Commission (IHRC). (Dkt. 15-10 at ¶¶ 4-5). In June 2022, the IHRC issued its decision finding "probable cause" that illegal discrimination had occurred. (*Id.* at ¶ 8.) Meanwhile, Valenzuela took a new position with BEA as a security specialist, which is a non-union-represented position. (Dkt 13-1

**MEMORANDUM DECISION AND ORDER - 1**

at p. 3). In February 2022, Valenzuela moved from his union-represented position to his new, non-union-represented position. (Dkt. 13-3 at ¶ 4).

BEA has an Employee Arbitration Program (Program) for its employees who are in non-union-represented positions. (Dkt. 13-1 at p. 2; Dkt. 13-3 at ¶ 2). The Program provides for the resolution of non-union-represented employees' disputes under the Federal Arbitration Act (FAA), 9 U.S.C. § 1, *et seq.* (Dkt. 13-3 at ¶ 6, Ex. C). For purposes of implementing the Program, BEA uses an automated system, called ServiceNow, to generate an arbitration agreement for an employee and to obtain his signature on it. (*See generally* Dkt. 13-3).

BEA does not require its non-union-represented employees to agree to arbitrate their disputes. (Dkt. 13-2 at p. 7). It requires, however, that employees who do not want to arbitrate their disputes to opt out of the arbitration agreement. (*Id.*). Once a non-union-represented employee is hired or a union-represented employee moves to a non-represented-position, as in this case, BEA's ServiceNow system generates an email sending an arbitration agreement to that employee, requires the employee to digitally sign the agreement, and then requires him to provide written notice of his election to opt out of the agreement within thirty days, if he does not agree to participate in arbitration. (*Id.* at p. 8; *see also generally* Dkt. 13-3).

On March 28, 2022--sometime after Valenzuela began his non-union-represented position with BEA but during the pendency of his charges of discrimination before the EEOC and IHRC related to his union-represented position--the ServiceNow administrator noticed the system had failed to send out "approximately 67 arbitration agreements that had gotten stuck," including Valenzuela's agreement. (Dkt. 13-3 at ¶ 5). The administrator "pushed out" the agreements, and the ServiceNow's "Audit Trail" shows Valenzuela received an arbitration agreement on March 28 with an email stating the agreement "contains directions for opting out of the program, **but all employees must read and sign the agreement before submitting an opt-out notice**." (Dkt. 13-3 at p. 7). The Audit Trail shows Valenzuela reviewed this email on March 29, received auto-generated emails on April 15 and 23 reminding him to sign the agreement, and viewed and signed the agreement on April 27 (hereafter "the Agreement). (*Id.* at 13-3 at ¶¶ 5-9). Valenzuela states he "did not review the details" of the Agreement before signing it. (Dkt. 15-10 at ¶ 13).

During this timeframe when Valenzuela received, viewed, and signed the Agreement, he was represented by legal counsel regarding the employment dispute with BEA, as discussed above. On January 20, 2023, Valenzuela filed a complaint against Defendants, alleging both federal and

MEMORANDUM DECISION AND ORDER - 2

state employment-related claims. (*See generally* Dkt. 1). On April 14, BEA's trial counsel asked if Valenzuela was amenable to entering a stipulation to stay this case and proceed to arbitration and provided Valenzuela's counsel a copy of the Agreement. (Dkt. 15-7).

The Agreement was countersigned by BEA's general counsel and provides, in part, that Valenzuela and BEA "agree that any legal dispute or controversy arising out of, relating to, or concerning [Valenzuela's] employment or termination of employment with BEA . . . shall be resolved by final and binding arbitration." (Dkt. 13-3 at p. 8). Further, the Agreement stated arbitration is not a "mandatory condition" of Valenzuela's employment, described the opt-out procedure, explained his continued employment without opting out would constitute mutual acceptance of the Agreement, and advised him of his right to consult his legal counsel regarding the Agreement and his right to opt out of it. (*Id.* at pp. 9-10).

Upon receipt of the Agreement, Valenzuela's counsel responded to BEA's trial counsel that "I am very concerned that BEA's legal counsel's office was having contact with my client and getting him to waive his rights to a jury trial," despite knowing she represented Valenzuela regarding his BEA employment. (Dkt. 15-8 at p. 1). BEA's trial counsel replied that "BEA's legal counsel's office does not have contact with any employee" and explained BEA provides non-union-represented employees with the arbitration agreement "through an automated roll-out system coordinated through HR and software operated by the information management team." (*Id.*).

Thereafter, on May 8, 2023, BEA moved to stay the proceedings in this case and to compel arbitration under the Agreement. (Dkt. 13). On May 11, Valenzuela's counsel sent BEA's trial counsel an email "providing BEA with [Valenzuela's] written notice of his intent to opt out of" the Agreement. (Dkt. 15-9 at p. 1). The next day, Valenzuela also sent BEA notice of his intent to opt out of the Agreement. (Dkt. 15-11). On May 30, Valenzuela responded to BEA's motion, asserting the Agreement violates Idaho public policy and, thus, is unenforceable. (Dkt. 15 at p. 4).

## LEGAL STANDARD

The FAA controls the enforcement of arbitration clauses. *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 67 (2010). It provides an arbitration agreement "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Further, it enunciates a strong federal policy favoring arbitration and requires courts to "rigorously enforce agreements to arbitrate." *Dean Witter Reynolds, Inc. v. Byrd*,

MEMORANDUM DECISION AND ORDER - 3

470 U.S. 213, 221 (1985). Where there is an arbitration clause within a contract, "there is a presumption of arbitrability." *AT&T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 650 (1986).

Section 3 of the FAA "requires courts to stay litigation of arbitral claims pending arbitration of those claims 'in accordance with the terms of the agreement'; and Section 4 requires courts to compel arbitration 'in accordance with the terms of the agreement' upon the motion of either party to the agreement (assuming that the 'making of the arbitration agreement or the failure . . . to perform the same' is not at issue)." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344 (2011). Under the FAA, a party seeking to compel arbitration has the burden to show: (1) the existence of a valid, written agreement to arbitrate; and, if it exists, (2) the agreement to arbitrate encompasses the dispute at issue. *Ashbey v. Archstone Prop. Mgmt., Inc.*, 785 F.3d 1320, 1323 (9th Cir. 2015).

## ANALYSIS

In support of its motion to compel arbitration, BEA argues the Agreement is valid and encompasses Valenzuela's claims in this case. Specifically, BEA notes the Agreement states at section 2.A. that it "applies to any dispute arising out of or related to your employment with BEA or relationship with any of its agents [or] employees . . . regardless of its date of accrual and survives after the employment termination terminates." (Dkt. 13-3 at p. 8). BEA contends this language is broad enough to encompass Valenzuela's claims despite that they are premised on factual issues predating the Agreement's execution when Valenzuela was in a union-represented position. (Dkt. 13-1 at p. 6).

Valenzuela does not dispute the Agreement encompasses his claims in this case.[1] Rather, he argues the Agreement violates Idaho public policy and, thus, is unenforceable. Valenzuela reasons that: Rule 4.2 of the Idaho Rules of Professional Responsibility prohibited BEA's legal counsel from communicating with Valenzuela, except through his legal counsel. BEA's "legal department prepared the contract and the email for distribution." (Dkt. 15 at p. 2). BEA's general counsel counter-signed the Agreement. BEA violated Rule 4.2 by sending the Agreement to Valenzuela, despite knowing legal counsel represented him. As a result of this purported ethical

---

[1] For example, Valenzuela does not address whether the collective bargaining agreement covering his union-represented-position impacts the resolution of his claims arising from his employment in that position or whether that agreement contains an arbitration provision.

**MEMORANDUM DECISION AND ORDER - 4**

violation, the Agreement violates Idaho public policy and, thus, is illegal and unenforceable. (Dkt. 15 at pp. 4-11).

Whether the parties agreed to arbitrate is a matter of state contract law. *Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1414-15 (2019) (noting Ninth Circuit applied California law to determine enforceability of arbitration agreement). In this case, both parties cite *Kosmann v. Dinius*, 446 P.3d 433 (2019), in which Kosmann raised the issue of whether an ethical violation of Rule 4.2 rendered an agreement unenforceable. *Kosmann*, 446 P.3d at 439-40. In that case, Kosmann sued his former attorney, Dinius. *Id*. at 436. During a mediation of the dispute, the parties—who were both represented by counsel—reached a tentative settlement agreement. *Id*. at 437. Then, unbeknownst to Kosmann's counsel, Kosmann requested to speak privately with his opponent, attorney Dinius. *Id*. During this private meeting, Kosmann and Dinius orally agreed to a new settlement amount and different terms. *Id*.

After the mediation, the parties could not agree on a written settlement agreement, and Dinius moved to enforce the oral agreement resulting from his private meeting with Kosmann. *Id*. In response, Kosmann filed a cross-motion to enforce the tentative settlement agreement reached with the mediator. *Id*. Resolving these motions, the district court ruled the oral agreement between Kosmann and Dinius was enforceable. *Id*. On appeal to the Idaho Supreme Court, Kosmann argued "the district court erred in applying contract law principles to determine whether the settlement agreement was enforceable . . . and in declining to decide whether a violation of Rule 4.2 rendered the agreement unenforceable." *Id*. at 439. The Court noted the question of whether an ethical violation impacts a contract's enforceability was "an issue of first impression in Idaho." *Id*. at 441. The Court, however, avoided the question, ruling that "Kosmann has cited no authority for his position that the law of contracts must be entirely abandoned when ethical concerns are raised" and that "accordingly, the district court correctly applied contract law principles in determining whether the oral settlement agreement . . . was enforceable." *Id*.

The Idaho Supreme Court in *Kosmann* also declined to consider whether Dinius violated Rule 4.2. *Kosmann*, 446 P.3d at 441. It ruled instead that the Idaho State Bar should determine whether Dinius committed an ethical violation: "Even if a contract could be deemed void or violative of public policy for [an ethical violation], there are no findings in the record as to whether Dinius . . . actually violated the Idaho Rule of Professional Conduct because the trial court properly left that determination to the State Bar." *Id*. Regarding this latter ruling, the Idaho Supreme Court

**MEMORANDUM DECISION AND ORDER - 5**

has since limited *Kosmann* "to its facts." *Hepworth Holzer, LLP v. Fourth Judicial Dist. of State*, 496 P.3d 873, 880 (Idaho 2021). This limitation, however, relates only to the suggestion in *Kosmann* that the Idaho State Bar and not a trial court should make findings regarding ethical violations. *Hepworth Holzer*, 496 P.3d at 880. Contrary to this suggestion in *Kosmann*, the Idaho Supreme Court in *Hepworth Holzer* ruled that deciding a matter "grounded in the ethical rules" is properly within the trial court's discretion."[2]

Despite subsequently limiting its ruling in *Kosmann*, the Idaho Supreme Court's ruling that contract principles apply to determine the enforceability of a contract despite a possible ethical violation remains good law. 446 P.3d at 441 (ruling trial court correctly applied contract principles to determine contract's enforceability). In this case, Valenzuela offers no basis to conclude the Agreement is unenforceable under applicable contract principles. Moreover, even if an ethical violation impacted the Agreement's enforceability, Valenzuela has not refuted BEA's showing the Agreement resulted from the implementation of a routine employment policy versus from any communication between Valenzuela and BEA's legal counsel. This showing includes that: The Program was a universal policy which began in 2019, applied to all non-union-represented positions, and was managed by the human resources department. The Program was implemented by automated system. The automated system sent a form arbitration agreement to numerous employees, including Valenzuela, because they had begun non-union-represented positions, and neither BEA nor its legal counsel targeted Valenzuela in an endeavor to trick him—"by subterfuge or deceit" as he asserts—into signing the Agreement. Further, Valenzuela has not cited any authority that such a non-targeted communication from human resources to an employee violates Idaho public policy.

That Valenzuela failed to read the Agreement does not relieve him of its terms, as he suggests. Idaho law is well established that a person who has executed a contract is presumed to be capable of understanding the nature and effect of such contract. *Liebelt v. Liebelt*, 801 P.2d 52, 55 (Idaho Ct. App. 1990). "[A] written contract cannot be avoided by one of the parties to it on the ground that he signed it without reading it and did not understand it." *Id*. "[F]ailing to read

---

[2] Because the Idaho Supreme Court has limited *Kosmann* to its facts, this Court rejects Valenzuela's suggestion that *Kosmann* "requires findings by the Idaho State Bar." (*See* Dkt. 15 at p. 12) (arguing "Valenzuela should be allowed to submit a complaint to the bar" before case proceeds).

the contract or to have it read to him or to otherwise inform himself as to the nature, terms and conditions of the contract . . . is an insufficient ground upon which to set the contract aside." *Id.* at 55-56.

Valenzuela has failed to show that the Agreement is void against public policy or otherwise unenforceable or that it does not encompass his claims at issue in this case. Accordingly, the Court grants Defendants' motion to stay this case and compel arbitration.

## ORDER

**IT IS HEREBY ORDERED:**

Defendants' Motions to Stay Proceedings and Compel Arbitration (Dkts. 13 and 14) are **GRANTED**. The parties shall notify the Court when arbitration is completed. If not completed by **May 1, 2024**, the parties shall file a joint report regarding the status of the arbitration proceedings.

DATED: October 16, 2023

Amanda K. Brailsford
U.S. District Court Judge

MEMORANDUM DECISION AND ORDER - 7